No. 22-1843

# United States Court of Appeals
# For the First Circuit

KAMBIS ANVAR; MICHELLE DRUM,

Plaintiffs – Appellants,

VINCENT COLAPIETRO; MICHAEL OSEAN,

Plaintiffs,

v.

ELIZABETH K. DWYER, in her official capacity as Interim Director of RI Department of Business Regulation; PETER F. NERONHA, in his official capacity as Attorney General of Rhode Island; RHODE ISLAND RESPONSIBLE BEVERAGE ALCOHOL COALITION, INC.

Defendants – Appellees.

---

**BRIEF OF DEFENDANTS-APPELLEES PETER F. NERONHA AND ELIZABETH K. DWYER, IN THEIR OFFICIAL CAPACITIES AS RHODE ISLAND ATTORNEY GENERAL AND INTERIM DIRECTOR OF THE DEPARTMENT OF BUSINESS REGULATION**

Appeal from a Final Judgment of the United States District Court for the District of Rhode Island; 1:19-cv-00523

---

Michael W. Field, No. 91695
Assistant Attorney General
Rhode Island Office of Attorney General
150 South Main Street
Providence, Rhode Island 02903
Tel: (401) 274-4400 ext. 2380

## Table of Contents

TABLE OF AUTHORITIES ...................................................................ii

I.    INTRODUCTION ...................................................................... 1

II.   STATEMENT OF ISSUES ...................................................... 4

III.  STATEMENT OF THE CASE .................................................. 6

   A. History of Alcohol Regulation, the 21st Amendment,
      and the Three Tier System ......................................................... 6

   B. Rhode Island's Regulation of Alcohol ...................................... 9

IV.   SUMMARY OF THE ARGUMENT ...................................... 18

V.    ARGUMENT ......................................................................... 20

   A. The Relationship Between the Commerce Clause and the
      Twenty First Amendment ........................................................ 20

   B. Caselaw Allows Licensed In-State Retailers – But Not Out-
      of-State Retailers – to Deliver Alcohol to Consumers .......... 25

         1. United States Supreme Court Caselaw .................. 26

         2. Post-Tennessee Wine Caselaw ............................... 31

   C. Rhode Island's Prohibition on Out-of-State Retailers
      Delivering Alcohol is Constitutional and an Essential
      Feature of the Three-Tier Model ........................................... 42

   D. Prohibiting Both In-State and Out-of-State Retailers From
      Shipping or Delivering Alcohol Through a Common Carrier
      is Constitutional ................................................................... 54

VI.   CONCLUSION ..................................................................... 64

CERTIFICATE OF COMPLIANCE ................................................ 65

CERTIFICATION .......................................................................... 66

ADDENDUM ..................................................................... A-001

## <u>Table of Authorities</u>

### <u>Case Law</u>

*Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185 (2d Cir. 2009)............... 32, 46

*B-21 Wines, Inc. v. Bauer*, 36 F.4th 214 (4th Cir. 2022) ..................*Passim*

*Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848 (7th Cir. 2000) ....... 32, 44

*Brooks v. Vassar*, 462 F.3d 341 (4th Cir. 2006) ...................................... 46

*Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28
    (1st Cir. 2007) .........................................................................*Passim*

*Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730
    (5th Cir. 2016).................................................................................. 46

*Granholm v. Heald*, 544 U.S. 460 (2005).......................................*Passim*

*Lebamoff Enterprises, Inc. v. Rauner*, 909 F.3d 847 (7th Cir. 2018)......61

*Lebamoff Enterprises, Inc. v. Whitmer*, 956 F.3d 863
    (6th Cir. 2020)..........................................................................*Passim*

*North Dakota v. United States*, 495 U.S. 423 (1990) ......................*Passim*

*Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171
    (8th Cir. 2021) .........................................................................*Passim*

*Tennessee Wine and Spirit Retailers Ass'n v. Thomas*, 139 S.Ct. 2449
   (2019) .......................................................................................*Passim*

*Wine and Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1
    (1st Cir. 2007) ........................................................................ 13, 51

*Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809
    (5th Cir. 2010) ................................................................. 32, 46, 61

### <u>Constitution</u>

U.S. Const. art. I, § 8, cl. 3 ......................................................................20

U.S. Const. amend. XXI ....................................................................8, 32

## <u>Statutes</u>

R.I. Gen. Laws § 3-1-5 ................................................................. 9

R.I. Gen. Laws § 3-1-6 ............................................................... 64

R.I. Gen. Laws § 3-4-6 ............................................................... 15

R.I. Gen. Laws § 3-4-8 ....................................................... *Passim*

R.I. Gen. Laws § 3-5-1 ................................................ 11, 25, 26

R.I. Gen. Laws § 3-5-11 ............................................................. 13

R.I. Gen. Laws § 3-5-11.1 .......................................................... 13

R.I. Gen. Laws § 3-5-14.1 .......................................................... 11

R.I. Gen. Laws § 3-5-15 ............................................................. 12

R.I. Gen. Laws § 3-5-17 ............................................................. 13

R.I. Gen. Laws § 3-6-9 ............................................................... 11

R.I. Gen. Laws § 3-6-10 ............................................................. 11

R.I. Gen. Laws § 3-6-16 ............................................................. 11

R.I. Gen. Laws § 3-7-1 ................................................ 11, 12, 15

R.I. Gen. Laws § 3-7-3 ................................................ 11, 12, 15

R.I. Gen. Laws § 3-7-15 ............................................................. 11

R.I. Gen. Laws § 3-7-18 ............................................................. 11

R.I. Gen. Laws § 3-7-22 ............................................................. 12

R.I. Gen. Laws § 3-7-23 ............................................................. 14

R.I. Gen. Laws § 3-7-28 ............................................................. 14

R.I. Gen. Laws § 3-7-29 ............................................................. 14

R.I. Gen. Laws § 3-8-1 ............................................................... 14

R.I. Gen. Laws § 3-8-4  .............................................................. 14

R.I. Gen. Laws § 3-8-5 ............................................................... 14

R.I. Gen. Laws § 3-8-5.1 ................................................................ 15, 31

**Public Laws**

P.L. 1933, ch. 2013 .......................................................................... 9

**Regulations**

230 R.I.C.R. § 30-10-1.4.3 ........................................................... 12

230 R.I.C.R. § 30-10-1.4.10 ..................................................... *Passim*

230 R.I.C.R. § 30-10-1.4.19 ...................................................... 10, 11

230 R.I.C.R § 30-10-1.4.27 ........................................................ 12, 13

230 R.I.C.R. § 30-10-1.4.30 .............................................................. 14

230 R.I.C.R. § 30-10-1.4.32 .............................................................. 14

## I.   INTRODUCTION

Following the ratification of the Twenty-first Amendment, many states imposed three-tier licensing systems aimed at regulating the transportation or importation of alcohol into a state.  According to the typical three-tier model, producers of alcohol (whether located in-state or out-of-state) may sell only to licensed in-state wholesalers, and in-state wholesalers may sell only to licensed in-state retailers.  *Granholm v. Heald*, 544 U.S. 460, 469 (2005).  Licensed in-state retailers may sell only to consumers.  Generally speaking, to reach a consumer, alcohol must pass through all three tiers.

On three separate occasions, the United States Supreme Court has constitutionally approved this three-tier licensing scheme.  A plurality of the Supreme Court observed that "[i]n the interest of promoting temperance, ensuring orderly market conditions, and raising revenue, the State has established a comprehensive system for the distribution of liquor within its borders. That system is unquestionably legitimate."  *See North Dakota v. United States*, 495 U.S. 423, 432 (1990) (plurality).  Justice Scalia added a fifth vote on the legitimacy of the three-tier model.  See *id*. at 447 (Scalia, J., concurring)

("The Twenty-first Amendment … empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler").

Fifteen years later, the Supreme Court again recognized the "unquestionably legitimate" three-tier model and incorporated Justice Scalia's concurring statement into the majority opinion. The Court observed: "We have previously recognized that the three-tier system itself is 'unquestionably legitimate.' *North Dakota v. United States,* 495 U.S., at 432, 110 S.Ct. 1986. *See also id.,* at 447, 110 S.Ct. 1986 (Scalia, J., concurring in judgment) ('The Twenty-first Amendment … empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler'."). *Granholm*, 544 U.S. at 489.

More recently, the Supreme Court recounted that "*Granholm* spoke approvingly of that basic model." *Tennessee Wine and Spirit Retailers Ass'n v. Thomas*, 139 S.Ct. 2449, 2471 (2019). This Court likewise has observed the three-tiered system has been "vouchsafed by no less an authority than the Supreme Court." *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 30 (1st Cir. 2007).

A necessary and essential consequence of the three-tier model is that only a licensed in-state retailer (who obtains the alcohol from a licensed in-state wholesaler) may sell alcohol to consumers.  Under the three-tier system, out-of-state retailers may not be licensed to sell alcohol within a given state because doing so would avoid the three tiers, e.g., alcohol would be sold within Rhode Island without passing through an in-state wholesaler or an in-state retailer.

Plaintiffs Kambis Anvar and Michelle Drum – two Rhode Island wine consumers – challenge Rhode Island's three-tier system and claim that a regime that allows in-state retailers to deliver alcohol to consumers, but does not allow out-of-state retailers to do so, is not an essential feature of the three-tier model and is unconstitutional. Allowing an out-of-state retailer to transport and deliver alcohol to a Rhode Island consumer would, of course, avoid the three-tier model Rhode Island adopted and that the Supreme Court vouchsafed as "unquestionably legitimate."

The District Court properly rejected the Plaintiffs' invitation to declare unconstitutional the in-state only delivery option, as well as a corresponding feature that prohibits *any* Class A retailer from

delivering alcohol to a consumer through the use of a common carrier or other third party. The District Court explained that the "in-state retailer requirement is an 'essential feature' of the state's three-tier system," and that "[g]iven the United States Supreme Court's endorsement of this system as 'unquestionably legitimate' and that finding in Plaintiffs' favor would dismantle this system, the Court cannot find that Rhode Island's alcohol regulatory system violates the dormant Commerce Clause." Addendum, at 8. The District Court's decision is consistent with "several lower courts [that] have permitted the States to prohibit out-of-state direct deliveries as a valid exercise of their Twenty-first Amendment authority." *Lebamoff Enterprises, Inc. v. Whitmer*, 956 F.3d 863, 871-72 (6th Cir. 2020) (discussing similar cases from the Second, Fifth, and Seventh Circuits). Consistent with the decisions from other courts of appeals, this Court should affirm.

## II.  STATEMENT OF ISSUES

Rhode Island has adopted a three-tier model where the producer of alcohol must sell to an in-state wholesaler, which in turn, must sell to an in-state retailer. The in-state retailer sells directly to the consumer and an in-state retailer may deliver alcohol to the consumer,

*provided* that the Class A retail owner (or an employee) delivers the alcohol directly to the consumer face-to-face.   230 R.I.C.R. § 30-10-1.4.10(B).  Rhode Island does not permit *any* retailer to deliver alcohol to a consumer through a common carrier or other third party.  Plaintiffs pose two questions, which naturally flow from the three-tier system:

1.  Whether Rhode Island's prohibition on out-of-state retailers importing alcohol into Rhode Island and delivering it to Rhode Island consumers is facially unconstitutional?

2.  If Question No. 1 is answered in the affirmative, is Rhode Island's prohibition that alcohol cannot be delivered to consumers by an in-state or an out-of-state retailer through a common carrier (although facially neutral) discriminatory in effect because it prevents out-of-state retailers from making home deliveries.

Plaintiffs pose a third question, but this issue is waived:

3.  Is Rhode Island's restriction on the amount of wine a consumer may bring into Rhode Island that was purchased from an out-of-state retailer unconstitutional

because no such limit is imposed on the transportation of

wine purchased from an in-state retailer?[1]

## III.  STATEMENT OF THE CASE

A.  <u>History of Alcohol Regulation, the 21st Amendment, and the
Three Tier System</u>

This Country's early years were a time of notoriously hard

drinking.  *See Tenn. Wine*, 139 S.Ct. at 2463.  Throughout the 19th

Century, social problems attributed to alcohol promoted waves of state

regulation, including licensing requirements.  *Id.*  One reason for the

excessive and irresponsible alcohol consumption was the "tied-house"

system, wherein "an alcohol producer, usually a brewer, would set up

saloonkeepers, providing them with premises and equipment, and the

---

[1] During oral argument, Plaintiffs' legal counsel withdrew this issue
from the District Court's consideration:

> I wish to let the Court know that we are no longer pursuing
> our claim that the personal transportation limit, which
> applied only to wine that crossed state lines, is
> unconstitutional … and so we don't think we should pursuit
> [sic] it without because its jurisdiction without standing.

Appendix, at 462.  The District Court immediately replied, "Great.
Thanks."  Appendix, at 462.  Having expressly withdrawn this issue
from the District Court's consideration, the Plaintiffs cannot now fault
the District Court.  This issue is waived.

saloonkeepers, in exchange, agreed to sell only that producer's products and to meet set sales requirements." *Id*. This model incentivized saloonkeepers to encourage high alcohol consumption. *Id*. at 2463 n.7; *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1176 (8th Cir. 2021) (noting the tied-house model is "widely perceived as causing or at least contributing to the social ills of excess alcohol consumption and consumption by minors").

The proliferation of alcohol-related issues gave rise to temperance movements and many states, including Rhode Island, passed laws restricting or prohibiting the sale of alcohol before the Eighteenth Amendment's ratification in 1919. Appendix, at 159. Rhode Island passed its first prohibition measure in 1852 and it lasted until 1863. Appendix, at 159. The temperance movement grew and Rhode Island again adopted bans on alcohol in 1874 and 1886. Appendix, at 159. The last state ban ended in 1889 in favor of a licensing law that allowed cities and towns to determine whether to be "wet" or "dry." Appendix, at 159. Prohibition was unpopular, its enforcement was weak, and it led to increased organized crime. Appendix, at 159. The experiment was short-lived.

In 1933, the Twenty-first Amendment was ratified: Section 1 repealed Prohibition and Section 2 empowered the states to regulate the transportation and sale of alcohol as each saw fit.  U.S. Const. amend. XXI.  Section 2 of the Twenty-first Amendment "grant[ed] the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." *Granholm*, 544 U.S. at 488.  "Given the special protection afforded to state liquor control policies by the Twenty-first Amendment, they are supported by a strong presumption of validity and should not be set aside lightly."  *North Dakota*, 495 U.S. at 433 (plurality).

Since the Twenty-first Amendment's ratification, many states have adopted some version of a three-tier system for the regulation of alcohol.  *See Granholm*, 544 U.S. at 466.  The three-tier system is designed to prevent the "tied-house" system that contributed to excessive consumption during the pre-Prohibition era. *See e.g., Sarasota Wine Mkt.*, 987 F.3d at 1176 (noting the "primary purpose" of the three-tier system "is to prevent a return to the English 'tied-house' system'"); *Lebamoff Enterprises*, 956 F.3d at 868 ("To avoid the tied-

house system's 'absentee owner' problem, businesses at each tier must be independently owned, and no one may operate more than one tier").

B.    Rhode Island's Regulation of Alcohol

Upon the Twenty-first Amendment's ratification in 1933, Rhode Island's statutory regulation of alcohol began with the declared purpose of "the promotion of temperance and for the reasonable control of the traffic in alcoholic beverages." R.I. Gen. Laws § 3-1-5; P.L. 1933, ch. 2013. Rhode Island adopted the three-tier model, requiring both wholesalers and retailers to maintain a physical presence in Rhode Island. For example, "[i]t shall be unlawful for any person in the business of selling intoxicating beverages in another state or country to ship or cause to be shipped any intoxicating beverage directly to any Rhode Island resident *who does not hold a valid wholesaler license issued by the State of Rhode Island.* The foregoing shall not apply to any order for intoxicating beverages personally placed by the purchaser at the manufacturer's premises, for shipment to an address in Rhode Island for nonbusiness purpose." R.I. Gen. Laws § 3-4-8(a) (emphasis

added).[2]  Regulations promulgated by the Rhode Island Department of

Business Regulation ("RI DBR") further provide that "[a]ll alcoholic

beverages brought into the State of Rhode Island for resale shall be

consigned and delivered to a licensed Rhode Island wholesaler."  230

---

[2] Approximately 26 states (at least as of 2005) allowed a limited
exception to the three-tier model where wine producers or
manufacturers, i.e., wineries, may ship its own product directly to a
consumer.  *Granholm*, 544 U.S. at 467.  Rhode Island has adopted such
an exception, which applies equally to in-state producers and out-of-
state producers.  *See* R.I. Gen. Laws § 3-4-8(a) ("The foregoing shall not
apply to any order for intoxicating beverages personally placed by the
purchaser at the manufacturer's premises, for shipment to an address
in Rhode Island for nonbusiness purpose.").

Plaintiffs' do not challenge the constitutionality of the limited producer
to consumer exception, although Plaintiffs suggest that this limited
exception undermines Rhode Island's three-tier system.  *See*
Appellants' Brief, at 26 n.11.  They cite no authority for the proposition
that a limited exception allowing consumers who visit an in-state or
out-of-state winery and purchase wine on the winery's premise to ship
home jeopardizes the entire three-tier system.  Indeed, "the Twenty-
first Amendment is not an either-or proposition[, but r]ather 'gives
each State leeway in choosing the alcohol-related public health and
safety measures that its citizens find desirable.'"  *B-21 Wines, Inc. v.
Bauer*, 36 F.4th 214, 226 (4th Cir. 2022).  As the Court of Appeals held
in addressing a similar argument – made by the same legal counsel as
this case – "North Carolina has decided that its three-tier system can
tolerate a limited exception for in-state and out-of-state wine
producers, allowing them to sell wine directly to consumers.  And that
exception is within North Carolina's constitutional power to create."
*Id*.

R.I.C.R. § 30-10-1.4.19(B)(1).  Rhode Island law also provides that "[a]ll holders of retail licenses except retail Class G licenses shall purchase beverages for sale under their licenses only from the holder or holders of wholesale licenses under this title."[3]  R.I. Gen. Laws § 3-7-18.

Rhode Island requires a license for the manufacture, sale, or importation of alcoholic beverages. *See* R.I. Gen. Laws § 3-5-1.  RI DBR is the licensing authority for in-state manufacturers and in-state wholesalers. *See* R.I. Gen. Laws § 3-5-14.1. Local cities and towns are the licensing authorities responsible for Class A retailer's licenses, the licenses needed to operate what is commonly known as a liquor store or liquor retailer. *See* R.I. Gen. Laws §§ 3-7-1, 3-7-3.

A wholesaler's license authorizes the holder to keep for sale and to sell alcoholic beverages at wholesale to license holders, such as Class A retailers. *See* R.I. Gen. Laws §§ 3-6-9, 3-6-10. Wholesalers are subject to a number of requirements, for example, they are required to purchase alcoholic beverages solely from a manufacturer (or from a contracted importer if a foreign supplier). *See* R.I. Gen. Laws § 3-6-16

---

[3] A Class G license allows alcohol to be sold on vehicles transporting passengers.  *See* R.I. Gen. Laws § 3-7-15.

11

(requiring licensed wholesalers to purchase only "from the distillery, rectifier, winery or brewery manufacturing the beverages or from the importer holding the basic contract with a foreign supplier whereby that foreign supplier exports distilled spirits, wines or malt beverages into the United States"). Wholesalers are also prohibited from having any interest—either direct or indirect—in any retailer's license or its business. *See* R.I. Gen. Laws § 3-7-22(a). If the prohibited interest is not disposed of within 30 days, the violator forfeits their license. *Id.*

Class A retail licenses are issued at the municipal level. *See* R.I. Gen. Laws §§ 3-7-1, 3-7-3, 3-5-15 (granting "town councils or license boards of the several towns" and "the mayors and city councils in the several cities" the "right, power, and jurisdiction to issue all other licenses authorized by this title"). Additional statutes and regulations effectively require a Class A retailer to have in-state *premises* (or presence) in Rhode Island. For example, RI DBR's Regulations require all Class A retail licenses identify a premise from which the alcoholic beverages will be sold, served, or stored. *See* 230 R.I.C.R. § 30-10-1.4.27(A). Other laws and regulations require a Class A license applicant to submit a drawing of the licensed premises to the local

licensing board, and mandate that prior to issuing a license, the city or town provide notice to the public of the location of the applicant's premises. *See* R.I. Gen. Laws § 3-5-17; 230 R.I.C.R. § 30-10-1.4.3 (notice must include, among other things, address of proposed licensed premise); 230 R.I.C.R. § 30-10-1.4.27(B)-(C) (requiring applicants to submit to local licensing board drawing of the licensed premises). The law further prohibits the sale, service or storage of alcoholic beverages outside the licensed premises. 230 R.I.C.R. § 30-10-1.4.27(B).

Rhode Island law also prohibits issuing Class A licenses to any "chain store organization," including chain retail and wholesale businesses, grocery stores, markets, department stores, and convenience stores. *See* R.I. Gen. Laws § 3-5-11. The chain store prohibition includes chains in which one or more stores are located outside of Rhode Island. *See* R.I. Gen Laws § 3-5-11(a). The franchising of Class A liquor licenses is similarly prohibited.[4]  *See* R.I. Gen. Laws § 3-5-11.1.

---

[4] This Court upheld Rhode Island's statutory prohibition on the franchising of Class A retail licenses and issuance of licenses to chain stores. *See Wine and Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 4 (1st Cir. 2007).

In addition to the prohibition on franchising and chain-store arrangements, Class A retailers are also subject to myriad laws and regulations governing the sale of alcohol. For example, Rhode Island law: restricts the hours and days a Class A retailer is legally permitted to sell alcohol, R.I. Gen. Laws §§ 3-7-23, 3-8-1; requires Class A retailers to carry liquor liability insurance in addition to commercial, general liability and property damage insurance, R.I. Gen. Laws § 3-7-29; prohibits Class A retailers from holding distilled spirits in a container larger than 3 liters, 230 R.I.C.R. § 30-10-1.4.32; and requires Class A retailers to retain records of all wholesale purchases for one year and to make these records available to RI DBR on demand, R.I. Gen. Laws § 3-7-28, 230 R.I.C.R. § 30-10-1.4.30.

There are also many laws in place related to the sale of alcohol to (or by) underage persons. *See* R.I. Gen. Laws § 3-8-4(a) (prohibiting sale of alcoholic beverages to an individual under 21 years of age); R.I. Gen. Laws § 3-8-4(b) (setting 18 as minimum age of Class A retailer's employee authorized to sell alcoholic beverages); and R.I. Gen. Laws § 3-8-5 (setting penalties up to $750 for sale of alcohol to a person under 21 years of age). Rhode Island also allows the use of "compliance

checks," colloquially known as "sting operations," wherein underage individuals acting as agents for the State or municipal police departments, are sent into Class A retailers to test whether they illegally sell alcohol to the minor. *See* R.I. Gen. Laws § 3-8-5.1.

Once issued, a Class A retailer's license permits the holder to "keep for sale and to sell at the place described beverages at retail." R.I. Gen. Laws §§ 3-7-1; 3-7-3. A Class A retailer is also authorized "to deliver the beverages in a sealed package or container, which package or container shall not be opened nor its contents consumed on the premises where sold." *See id.* "A Class A alcoholic beverage licensee may deliver alcoholic beverages to the residence of a customer." 230 R.I.C.R. § 30-10-1.4.10.

The delivery of alcoholic beverages by a Class A retailer to a Rhode Island consumer is heavily regulated. Neither an out-of-state retailer nor an in-state retailer may ship alcoholic beverages through a common carrier.[5] *See* R.I. Gen. Laws § 3-4-6 ("[e]very express carrier,

---

[5]Plaintiffs proffer that "Rhode Island allows its own retailers to take wine orders over the internet, by telephone, or through a third-party service like Drizly, and deliver it to consumers." Appellants' Brief, at 8. To avoid any confusion, a Class A retailer may take an order over the internet, by telephone, or through a third-party service, *but in all*

15

common carrier, or other person who, for the purpose of carrying to any

other person, receives any beverage which has been sold or is intended

for sale in violation of this title"). Only the owner of the Class A retail

establishment or one of their employees can make the delivery. *See* 230

R.I.C.R. § 30-10-1.4.10(B).[6] When making a delivery, a Class A licensee

_____

*circumstances*, the Class A retailer (or its employee) must deliver the
alcohol through a face-to-face meeting with the consumer.  A third
party common carrier or delivery service may not deliver alcohol from
a Class A retailer to a consumer.

Plaintiffs' reference to Admission No. 5 does not provide otherwise.
This Request for Admission sought: "Admit that licensed wine retailers
located in Rhode Island may accept orders for wine placed through
Drizly and may deliver wine to Rhode Island residents."  Appendix, at
148.  The State responded: "[n]otwithstanding and without waiving
said objection, admitted to the extent that the requirements of 230 R.I.
Code R. 30-10-1.4.10 are satisfied."  Appendix, at 148.  This point was
also clarified during oral argument:

> THE COURT:    So it's no different than the retailer having
> their own website allowing for delivery because it still
> requires that the retail – licensed retail establishment
> employee do the delivery and keep the records.

> MS. SHEA:        That's exactly correct, your Honor.

Appendix, at 533.

[6] Rhode Island allows common carrier delivery from a farmer wine
producer (i.e., winery) to a consumer, but the purchase must be made
by the consumer on the winery's premise.  *See* R.I. Gen. Laws § 3-4-8(a)
("The foregoing shall not apply to any order for intoxicating beverages

(or an employee) must ensure that the alcoholic beverage is not delivered to an individual under the age of twenty-one and must check a valid form of identification with a photograph. 230 R.I.C.R. § 30-10-1.4.10(A). A Class A licensee (or an employee) can only make a sale and delivery of alcohol during its legal business hours *and the delivery must occur face-to-face, i.e., by the owner or employee of the retailer to the consumer. See* 230 R.I.C.R. § 30-10-1.4.10(B).  For each delivery, a Class A retailer is required to have an invoice that sets forth the name

_____

personally placed by the purchaser at the manufacturer's premises, for shipment to an address in Rhode Island for nonbusiness purpose."). While Rhode Island does allow common carrier delivery from a producer or manufacturer where a consumer purchases the alcohol on the winery's premise (as set forth in R.I. Gen. Laws § 3-4-8(a)), Rhode Island does not permit common carrier delivery at the retail level.  In other words, Rhode Island requires a consumer to be physically present at the farmer winery when purchasing the alcohol (which might then be delivered through a third party) or requires the consumer to be physically present when the alcohol is being delivered by the Class A licensee (or its employee) at the retail level.  In either case, a physical presence (or face-to-face) requirement is imposed either at the purchasing stage or the delivery stage.  Plaintiffs do not challenge this distinction and through this constitutional challenge seek a situation where a consumer could obtain alcohol without a physical presence (or being face-to-face) with a Class A retailer (or an employee).  Rhode Island has chosen to act within its constitutional power and prohibit the sale and/or delivery of alcohol without the consumer being physically present at either the purchase or delivery stage.

of the licensed establishment or person making the delivery, the purchaser's name and address, the delivery date, a list of the products being delivered, and the signature of the person to whom the alcohol was delivered. *See* 230 R.I.C.R. § 30-10-1.4.10(C).

## IV.  SUMMARY OF THE ARGUMENT

Plaintiffs ask this Court to allow out-of-state retailers to sell and deliver alcohol directly to Rhode Island consumers, thus avoiding the three-tier system that in-state retailers must traverse and that the Supreme Court has vouchsafed as "unquestionably legitimate."  In doing so, Plaintiffs challenge the requirements that alcohol retailers: have a physical presence in Rhode Island, obtain alcohol from an in-state wholesaler, and prohibit the delivery of alcohol to consumers via common carrier.

The District Court properly rejected these claims and applied the two prong "different" test framework articulated in *Tennessee Wine*. Applying this test, the District Court explained that "[g]iven the United States Supreme Court's endorsement of this system as 'unquestionably legitimate' and that finding in Plaintiffs' favor would dismantle this system, the Court cannot find that Rhode Island's alcohol regulatory

system violates the dormant Commerce Clause." Addendum, at 8. The District Court added that "[a]n in-state retailer requirement is an 'essential feature' of the state's three-tier system of alcohol regulation and promotes the health and safety of Rhode Islanders because it allows the state to conduct on-site inspections and audits to check compliance with the law, and to revoke operating licenses providing 'strong incentives not to sell alcohol' in a way that threatens public health or safety. Addendum, at 8-9 (citing *Tenn. Wine*, 139 S.Ct. at 2475).

As numerous courts of appeals have already determined, the three-tier model is critical to ensuring public health and safety and necessary for proper regulation and enforcement measures. Requiring that alcohol retailers maintain a physical presence within a given state is an essential requirement that necessarily flows from the three-tier model. Restrictions akin to those in Rhode Island have consistently been upheld by courts of appeals across the country. Plaintiffs' argument that Rhode Island's laws restrict consumer access to the wine market of other states is similarly unsupported in law and overstated; there are numerous factors unrelated to Rhode Island's

direct-shipping restriction that affect the availability of wine. As demonstrated, *infra*, Rhode Island's laws advance Twenty-first Amendment interests and are supported by concrete evidence.

## V.    ARGUMENT

A.    <u>The Relationship Between the Commerce Clause and the Twenty First Amendment</u>

Because Plaintiffs raise Commerce Clause challenges to Rhode Island's laws regulating alcohol, which authority is bestowed in Section 2 of the Twenty-first Amendment, it is critical to examine the relationship between the Commerce Clause and the Twenty-first Amendment. The Commerce Clause grants Congress the power to "regulate Commerce … among the several States…" U.S. Const. art. I, § 8, cl. 3. It has long been held that "state laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Granholm*, 544 U.S. at 472. The analysis is "different," however, when the challenged law involves state regulation of alcohol.

Because Section 2 of the Twenty-first Amendment granted states "virtually complete control" over regulation of alcohol within its

borders, "a different inquiry" is appropriate when the challenged law concerns a state's regulation of alcohol. *See Tenn. Wine*, 139 S.Ct. at 2474. Under this "different inquiry," a two-step framework must be assessed. "First a court must ask whether the challenged regime discriminates against interstate commerce." *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 222 (4th Cir. 2022) (citing *Tenn. Wine*, 139 S.Ct. at 2474). If the answer is no, the assessment ends and the challenged provision is constitutional. *Id*. On the other hand, "if the inquiry is answered in the affirmative, the court proceeds to the second step and assesses 'whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground.'" *Id*. (quoting *Tenn. Wine*, 139 S.Ct. at 2474). If "the predominant effect of a law is protectionism, not the protection of public health or safety, it is not shielded by § 2." *Tenn. Wine*, 139 S.Ct. at 2474. To demonstrate a nonprotectionist ground, the State must present "concrete evidence"—not "mere speculation" or "unsupported assertions" — showing that its challenged laws advance public health or safety. *See id.*

Plaintiffs incorrectly articulate this test. Most notably, Plaintiffs suggest the District Court incorrectly applied the standard of review, claiming that the "narrow-tailoring standard is a form of intermediate scrutiny where the court looks at how well the regulation fits the problem, i.e., whether a law advances a permissible state goal with reasonable precision and without unnecessary discrimination. The availability of less discriminatory alternatives is an indication that the law being challenged is not narrowly tailored."[7] Appellants' Brief, at 10.

In *B-21 Wines*, the same attorneys made a similar argument. As recounted by the Fourth Circuit, the plaintiffs argued:

> instead of asking whether the discriminatory treatment by North Carolina is 'justified as a public health or safety measure or on some other legitimate nonprotectionist ground,' the district court should have assessed – and we should now assess – *whether such treatment advances 'an important regulatory interest that could not be furthered by reasonable nondiscriminatory alternatives*.'

---

[7] In the District Court, Plaintiffs never argued that "intermediate scrutiny" should apply and they should not be permitted to argue this issue on appeal as it has been waived. Rather, in the District Court, Plaintiffs argued for "exacting" or "close" scrutiny. *See* ECF Nos. 58 & 80. *See also* Addendum, at 6 n.5 ("Plaintiffs argue that the more rigorous 'searching scrutiny' standard applies, while Defendants argue for the less stringent 'different inquiry' test."). In any event, *Tennessee Wine* did not adopt an intermediate scrutiny test.

36 F.4th at 224 (emphasis added).

The Fourth Circuit rejected this argument, explaining "[t]he Plaintiffs concede[d] on appeal that, when a statute regulating products other than alcoholic beverages is challenged, the ordinary dormant Commerce Clause analysis applies, triggering 'a variant of strict scrutiny' and requiring invalidation of the discriminatory statute 'unless the state demonstrates both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means.'" *Id*. at 225. Because of the Twenty-first Amendment, however, "a less demanding standard of review must necessarily apply to an alcoholic beverage control regime than to regulations involving other products. Put most simply, applying the same stringent test to an alcoholic beverage control regime would undermine Section 2 of the Twenty-first Amendment." *Id*.

To be sure, Plaintiffs aver that *Tennessee Wine* held that "'the law can be sustained only on a showing that it is narrowly tailored to 'advanc[e] a legitimate local purpose' protected by the Twenty-first Amendment." Appellants' Brief, at 10 (quoting *Tenn. Wine*, 139 S.Ct. at 2461). Plaintiffs simply ignore the language that precedes the

23

quotation: "*Under our dormant Commerce Clause cases*, if a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to 'advanc[e] a legitimate local purpose.'" *Tenn. Wine*, 139 S.Ct. at 2461 (emphasis added).

After making this general dormant Commerce Clause observation – and citing non-alcohol related Commerce Clause cases – the Supreme Court observed that Tennessee's durational residency requirement "plainly favors Tennesseans over nonresidents" and that no party sought to defend the residency requirement "under the standard that would be triggered if the requirement applied to a person wishing to operate a retail store that sells a commodity *other than alcohol*." *Id.* (emphasis added). But, because the residency requirement did concern alcohol, the Court focused on the Twenty-first Amendment, *id.*, and concluded, "we engage in a different inquiry." *Id.* That different inquiry is the two-step framework discussed herein, which does not include a narrow tailoring analysis. Indeed, other than the quotation advanced by Plaintiffs – the one that set forth the general Commerce Clause test absent a Twenty-first Amendment interest –

*Tennessee Wine* does not otherwise mention "narrow tailoring." *See e.g.*, *Lebamoff Enterprises*, 956 F.3d at 871 ("We ask only whether the law 'can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground.'").  In sum, *Tennessee Wine* does not support a narrow tailoring analysis.

B.    <u>Caselaw Allows  Licensed In-State Retailers – But Not Out-of-State Retailers – to Deliver Alcohol to Consumers</u>

Plaintiffs argue that prohibiting out-of-state retailers from delivering wine directly to Rhode Island consumers is a facial violation of the Commerce Clause because in-state retailers are permitted to deliver wine to in-state consumers. *See* Appellants' Brief, at 3. Plaintiffs suggest that such a prohibition is borne from the combination of R.I. Gen. Laws § 3-5-1 and "the fact that Rhode Island has no license that would allow an out-of-state retailer to make home deliveries[.]" *See* Appellants' Brief, at 5.

Rhode Island General Laws § 3-5-1 provides, in full, "[n]o person shall at any time manufacture or sell or suffer to be manufactured or sold or keep or suffer to be kept on his or her premises or possession or under his or her charge for the purpose of sale within this state any beverage unless licensed to do so as provided in this title; and except

as provided in this title no person shall import, or suffer to be imported beverages into this state." This provision is not discriminatory on its face; it treats unlicensed out-of-state retailers the same as unlicensed in-state retailers. It is not limited to out-of-state actors, but rather prohibits a person from selling or importing alcohol if not licensed.

Plaintiffs are correct that an out-of-state retailer with a physical presence outside of Rhode Island cannot obtain a Class A retailer's license, but they overlook that this result is the product of the three-tier model and that R.I. Gen. Laws § 3-5-1 applies equally to all persons regardless of residency or presence. As discussed below, *Granholm* and *Tennessee Wine* set the stage for the several courts of appeals that have examined this issue post-*Tennessee Wine*, all of which have upheld state laws allowing in-state retailers (but not out-of-state retailers) to deliver alcohol to consumers.

1.   United States Supreme Court Caselaw

In *Granholm*, the Supreme Court examined challenges to state laws regulating the sale of wine from out-of-state wineries (producers or manufacturers) directly to consumers in Michigan and New York. 544 U.S. 460 (2005). The Court summarized that while the two

regulatory schemes differed, "the object and effect of the laws are the same: to allow in-state-wineries to sell wine directly to consumers in that State but to prohibit out-of-state wineries from doing so, or, at the least, to make direct sales impractical from an economic standpoint." *Id.* at 466.

The Court observed that Michigan and New York both adopted the three-tier model and that the Court had "previously held that States can mandate a three-tier distribution scheme in the exercise of their authority under the Twenty-first Amendment." *Id.* at 466 (citing *North Dakota*, 495 U.S. at 432; *id.* at 447 (Scalia, J., concurring in judgment)). While the three-tier system is "unquestionably legitimate," the challenged provisions in *Granholm* were held to be a discriminatory exception: the three-tier system was mandatory for sales from out-of-state wineries, but in-state wineries (within New York and Michigan) could sell directly to consumers and avoid the three-tier system. *Id.* at 467. The differential treatment "require[d] all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers." *Id.* at 474.

Over a decade later, the Supreme Court returned to the Twenty-first Amendment when it considered a Tennessee requirement that imposed a durational-residency requirement on all individuals and businesses seeking to obtain or renew a liquor store license. *See Tenn. Wine*, 139 S.Ct. at 2449. Under Tennessee law, to obtain an initial retail license, an individual must be a "bona fide resident" of Tennessee for at least two years. *Id*. at 2457. Corporations could not obtain a license unless all of its officers, directors, and owners of capital stock satisfied the durational-residency requirements applicable to individuals. *Id*.

Under dormant Commerce Clause jurisprudence, the Court observed (as Plaintiffs point out, *supra*) that if a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to "advanc[e] a legitimate local purpose." *Id*. at 2461. Applying this Commerce Clause test, the Court observed that "Tennessee's 2-year durational-residency requirement plainly favors Tennesseans over nonresidents." *Id*. at 2462. Notwithstanding this discrimination conclusion, however, the constitutional analysis

continued. Because the statute regulated alcohol – and not other consumer goods unprotected by the Constitution – the Supreme Court explained that it applies a "different inquiry." The Court elucidated that because:

> § 2 was adopted to give each State the authority to address alcohol-related public health and safety issues in accordance with the preferences of its citizens, we ask whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground. Section 2 gives the States regulatory authority that they would not otherwise enjoy, but as we pointed out in *Granholm*, 'mere speculation' or 'unsupported assertions' are insufficient to sustain a law that would otherwise violate the Commerce Clause. . . . Where the predominant effect of a law is protectionism, not the protection of public health or safety, it is not shielded by § 2.

*Id.* at 2474.

Applying this "different test," the Court concluded that Tennessee's durational-residency requirement was "not needed to enable the State to maintain oversight over liquor store operators." *Id.* at 2475. Importantly, the *Tennessee Wine* Court explained that any asserted non-protectionist interests were "even less persuasive" because "*the stores at issue are physically located within the State. For that reason, the State can monitor the stores' operations through on-site inspections, audits and the like.*" *Id.* at 2475 (emphasis added). While

29

*Tennessee Wine* held unconstitutional a statute requiring that retailer owners maintain a two-year residency prior to licensing, the import for the instant case is that certain non-protectionist interests – such as on-site inspections – can be achieved only (or at least feasibly) through a physical-presence requirement.

Plaintiffs curiously relegate to the closing pages of its Brief the blockbuster statement that "[t]he Supreme Court has held that it is unconstitutional to require residency or physical presence as a precondition to doing business." Appellants' Brief, at 37. As it relates to "physical presence," Plaintiffs are wrong.[8]

*Granholm* noted – and Plaintiffs quote – that "States cannot require an out-of-state firm to become a *resident* in order to compete on equal terms." Appellants' Brief, at 37 (quoting *Granholm*, 544 U.S. at 475) (emphasis added). The State Defendants take no issue with this latter statement, but as *Tennessee Wine* demonstrates, a requirement that one demonstrate residency to compete in a state is an entirely

---

[8] Plaintiffs do not cite any authority that interpreted *Granholm* to prohibit a physical presence requirement and the State Defendants are unaware of any such authority. As discussed, *infra*, post-*Granholm* authority contravenes Plaintiffs' position.

different requirement than requiring physical presence to compete in a state. *See Tenn. Wine*, 139 S.Ct. at 2475 ("the [non-protectionist] argument is even less persuasive since the stores at issue are physically located within the State. For that reason, the State can monitor the stores' operations through on-site inspections"). *Granholm* did not declare a physical presence requirement unconstitutional.

2.    Post-*Tennessee Wine* Caselaw

After *Tennessee Wine*, three courts of appeals considered the precise issue presented in this case. Even though these three cases examined the same legal issue presented in this case – and despite being brought by the same legal counsel representing Plaintiffs – Plaintiffs pay these cases almost zero attention. The issue in all three cases concerned state laws barring out-of-state retailers (but not in-state retailers) from shipping or delivering alcoholic beverages directly to in-state consumers. In all three cases – and others that preceded *Tennessee Wine* – courts upheld the alleged unequal treatment.[9]

---

[9] Even prior to *Tennessee Wine*, "several lower courts have permitted the States to prohibit out-of-state direct deliveries as a valid exercise of their Twenty-first Amendment authority." *Lebamoff Enterprises Inc.*, 956 F.3d at 871. The Seventh Circuit upheld an Indiana statute that prohibited direct alcohol deliveries from out-of-state but allowed

In *Lebamoff Enterprises*, the Court of Appeals reviewed a Michigan law that allowed licensed in-state retailers to deliver alcohol directly to consumers via common carrier or a state-licensed third-

---

in-state retailers and wholesalers to "'deliver directly to consumers' homes.'"  *Id.* (citing *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 853-54 (7th Cir. 2000)).  In *Bridenbaugh*, Judge Easterbrook explained that the Twenty-first Amendment necessarily authorizes some discrimination, as any regulation of the "transportation or importation into any state," U.S. Const. amend. XXI, § 2, necessarily protects local sellers by "leav[ing] intrastate commerce unaffected."  *Bridenbaugh*, 227 F.3d at 853.  Judge Easterbrook continued that the Twenty-first Amendment's history confirms that, at the very least, it authorized bans on direct deliveries from out-of-state retailers.  *See id.* at 851-53.  The Seventh Circuit added that the out-of-state delivery ban was not discriminatory, but rather "channel[ed]" all alcohol, from within the State and outside of it, through in-state distributors to facilitate state taxation and regulation, "precisely" the intent of the Twenty-first Amendment.  *Id.* at 854.  The Second Circuit upheld a similar statute that permitted in-state retailers to deliver alcohol to consumers' homes but barred out-of-state retailers from doing the same.  *See Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185 (2nd Cir. 2009).  Banning direct deliveries from out-of-state, the court reasoned, was necessary to ensure "all liquor sold within" the state passed through in-state wholesalers.  *Id.* at 186.  And, the Fifth Circuit upheld a Texas statute that allowed local delivery by in-state retailers, but prohibited deliveries from out-of-state retailers.  *See Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809, 812 (5th Cir. 2010).  The court explained that differential treatment of out-of-state deliveries was necessary to preserve the three-tier system and the regulatory objectives it served.  *Id.* at 819-20.  Like "carry[ing] the beverages to a customer's vehicle parked in [a retailer's] lot, or across the street," the court observed, in-state deliveries were a "constitutionally benign incident" of a three-tier system.  *Id.* at 819-20.

party facilitator, but did not allow out-of-state retailers a similar accommodation. 956 F.3d at 866. Michigan—like Rhode Island—requires retailers to have a physical presence in the state, *id.* at 870, and the Sixth Circuit addressed the issue in terms equally applicable to this case:

> [t]he parties agree that the Twenty-first Amendment allows Michigan to distribute alcohol within its borders solely through a three-tier system, one composed of producers, wholesalers, and retailers. And the parties agree that Michigan may impose all manner of regulations on its wholesalers (*e.g.*, that they be in the State, adhere to minimum prices, and decline to offer volume discounts) as well as on its retailers (*e.g.*, that they be present in the State, sell only within the State, and comply with health-and-safety rules). What separates the parties is whether Michigan may permit its retailers to offer at-home deliveries within the State while denying the same option to an Indiana retailer who does not have a Michigan retail license. *Because the Twenty-first Amendment permits Michigan to treat in-state retailers (who operate within the three-tier system) differently from out-of-state retailers (who do not), we uphold the law.*

*Id.* at 867 (emphasis added).

In addressing this issue, the Court of Appeals focused on whether an in-state presence was central to the three-tier system and asked – and then answered: "If Michigan may have a three-tier system that requires all alcohol sales to run through its in-state wholesalers, and if it may require retailers to locate within the State, may it limit the

delivery options created by the new law to in-state retailers? The answer is yes." *Id*. at 870. In arriving at this conclusion, the Court of Appeals applied the *Tennessee Wine* "different" test applicable to Commerce Clause challenges where alcohol regulations are at issue. *Id*. at 871.

Under the "different" test, the Sixth Circuit considered whether the out-of-state retailer shipping ban could "'be justified as a public health or safety measure or on some other legitimate nonprotectionist ground;'" the Court of Appeals concluded that Michigan's law "promotes plenty of legitimate state interests, and any limits on a free market of alcohol distribution flow from the kinds of traditional regulations that characterize this market, not state protectionism." *Id*. Critically, the Court of Appeals found persuasive authority for its non-protectionism conclusion, observing that "courts have frequently said that the Twenty-first Amendment permits a three-tier system of alcohol distribution, and the Commerce Clause does not impliedly prohibit it." *Id*. at 869 ("[n]othing stops States … from 'funnel[ing] sales through the three-tier system,' a practice that is 'unquestionably legitimate'").

Having recognized the "unquestionably legitimate" three-tier system, the Sixth Circuit explained that allowing in-state retailers to deliver its product to consumers – but not allowing out-of-state retailers to deliver (or for that matter, sell) its product to consumers, was a necessary consequence of the three-tier system. *See e.g., id*. at 870 ("federal courts also have permitted States, like Michigan, to require retailers to be physically based in the State"). The court added:

> [t]here is nothing unusual about the three-tier system, about prohibiting direct deliveries from out of state to avoid it, or about allowing in-state retailers to deliver alcohol within the State. Opening up the State to direct deliveries from out-of-state retailers necessarily means opening it up to alcohol that passes through out-of-state wholesalers or for that matter no wholesaler at all. … That effectively eliminates the role of Michigan's wholesalers. If successful, Lebamoff's challenge would create a sizeable hole in the three-tier system.

*Id*. at 872.

The Court of Appeals summarized: "Michigan could not maintain a three-tier system and the public-health interests the system promotes, without barring direct deliveries from outside its borders. No amount of additional money through spending appropriations or 'rais[ed] license fees,' … could change that reality." *Id*. at 873. Allowing out-of-state retailers to deliver or ship alcohol into the state

without passing through the three-tier model would contravene Michigan's non-protectionist interests protected by the Twenty-first Amendment. *Id*. at 874 ("even if Michigan could protect minors and ensure retailer accountability in other ways, there is no other way it could preserve the regulatory control provided by the three-tier system").

Similarly, in *Sarasota Wine Mkt.,* the Court of Appeals examined a challenge to a Missouri law allowing in-state retailers to ship alcohol directly to in-state consumers, provided the sale was made in-person, online, or by telephone through the retailer's licensed premises. 987 F.3d at 1176. The plaintiffs – which included a Florida retailer and Missouri residents – likewise sought direct delivery of out-of-state wines to Missouri consumers. *Id*. at 1175. The plaintiffs' arguments mirror those made in this case: imposing certain requirements, such as that a licensed retailer must maintain a physical presence within Missouri, "prevent[ed] out-of-state-retailers from shipping directly to Missouri consumers, [and] discriminate[d] against interstate commerce and citizens of other States in violation of the 'dormant' Commerce Clause[.]" *Id*. at 1175, 1176. Similar to *Lebamoff*, the

Eighth Circuit rejected this claim and explained that "[t]he [Supreme] Court recognized 'that the three-tiered distribution system itself is 'unquestionably legitimate.'" *Id.* at 1180. The court continued that *North Dakota*, *Granholm*, and *Tennessee Wine*:

> established that the ways in which a State implements its three-tiered system are not immune from dormant Commerce Clause scrutiny. The question in a particular case is "whether the principles underlying the Twenty-first Amendment are sufficiently implicated ... to outweigh the Commerce Clause principles that would be otherwise be offended." *Bacchus Imps.,* 468 U.S. at 275, 104 S.Ct. 3049; *see Granholm*, 544 U.S. at 488, 125 S.Ct. 1885. Courts must take into account a State's valid interests in regulating alcohol, such as promoting responsible consumption, preventing underage drinking, and collecting taxes. But economic protectionism "is not such an interest." *Tenn. Wine*, 139 S.Ct. at 2469.

*Id.* at 1180.

Having recognized the legitimacy of the three-tier system and focused on whether the challenged provisions advance a Twenty-first Amendment interest, the Court of Appeals examined Missouri's requirements that licensed liquor retailers be residents of Missouri, have a physical presence in the State, and purchase liquor sold in the State from licensed in-state wholesalers. *Id.* at 1182. With respect to these "licensing requirements and restrictions," the Court of Appeals

concluded that they "have been consistently upheld, before and after *Granholm* and *Tennessee Wine*, as essential to a three-tiered system that is 'unquestionably legitimate.'" *Id*.

The *Sarasota* Court added that *Tennessee Wine* did not mandate a contrary result because *Tennessee Wine* "invalidated a durational residency requirement that 'is not an essential feature of a three-tiered scheme.'" *Id*. at 1183.  By contrast, the Eighth Circuit explained, the *Sarasota* plaintiffs attack "core provisions of Missouri's three-tiered system that the [Supreme] Court again described as 'unquestionably legitimate.'" *Id*. at 1183.  Because "[t]he Missouri laws at issue in this case are an essential feature of its three-tiered scheme, and the rules governing direct shipments of wine to Missouri consumers apply evenhandedly to all who qualify for a Missouri retailers license," the out-of-state retailer shipping prohibition was upheld.  *Id*. at 1184.

More recently, the Fourth Circuit examined a North Carolina statutory scheme that prohibited out-of-state retailers – but not in-state retailers – from shipping wine directly to North Carolina consumers (hereafter the "Retail Wine Importation Bar").  *See B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 216-17 (4th Cir. 2022).  To ship wine

directly to North Carolina consumers, in-state retailers must obtain a permit, which may issue only to retail locations owned or managed by a North Carolina resident and having in-state physical premises available for inspection. *Id.* at 217.

The Fourth Circuit applied the two-step "different" framework test articulated in *Tennessee Wine*. First, "a court must ask whether the challenged regime discriminates against interstate commerce." *Id.* at 222. "If the answer to that inquiry is no, the court's assessment ends and the challenged regime is constitutional." *Id.* On the other hand, "if the inquiry is answered in the affirmative, the court proceeds to the second step and assesses 'whether the challenged [regime] can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground.'" *Id.* (alteration in original).

Applying this test, the Fourth Circuit concluded that the statutory regime allowing in-state retailers to ship alcohol to North Carolina residents, but not permitting out-of-state retailers to do so, was discriminatory in nature. *Id.* at 223. Therefore, the Court addressed the second prong of the *Tennessee Wine* test – whether the discriminatory regime is justified as a public health or safety measure

or some other legitimate nonprotectionist ground.  On that issue, the Court of Appeals observed that "the district court concluded that North Carolina's interest in preserving its three-tier system is itself a legitimate nonprotectionist ground that constitutes a sufficient justification." *Id.* at 227.  The Court of Appeals succinctly concluded, "we agree with that ruling." *Id.*

Relying upon *Tennessee Wine*, the Fourth Circuit continued that "'if § 2 granted States the power to discriminate in the field of alcohol regulation, that power would be at its apex when it comes to regulating the activity to which the provision expressly refers' – the importation and transportation for delivery of alcoholic beverages." *Id.* at 227 (quoting *Tenn. Wine*, 139 S.Ct. at 2471).  The court continued that "[t]he three-tier system – the regime that limits the importation of alcoholic beverages by requiring that they flow first from manufacturers to in-state wholesalers, then to in-state retailers, and only thereafter to consumers – by its nature discriminates to some extent against interstate commerce." *Id.*

Despite the discriminatory conclusion, the Fourth Circuit held that the in-state versus out-of-state delivery distinction promoted

North Carolina's Twenty-first Amendment interests and its three-tier

model:

> [u]nlike the discriminatory licensing requirement for retailers that the Supreme Court reviewed in *Tennessee Wine*, the Retail Wine Importation Bar is an integral part of North Carolina's three-tier system. To begin with, the Bar directly relates to North Carolina's ability to separate producers, wholesalers, and retailers. The Old North State requires that nearly all alcoholic beverages pass through each of the three tiers before being sold to consumers. *And the direct shipping of alcoholic beverages to North Carolina consumers by out-of-state retailers would completely exempt those out-of-state retailers from the three-tier requirement. That would open the North Carolina wine market to less regulated wine, undermining the State's three-tier system and the established public interest of safe alcohol consumption that it promotes.* As one of our sister circuits recently observed in similar circumstances, the opening of a state's wine market to retail wine shipments from outside the State "necessarily means opening it up to alcohol that passes through out-of-state wholesalers or for that matter no wholesaler at all." *See Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 872 (6th Cir. 2020), *cert. denied*, —— U.S. —— ——, 141 S. Ct. 1049, 208 L.Ed.2d 520 (2021). Eliminating the role of North Carolina's wholesalers in this way would create what the court of appeals in *Whitmer* appropriately called "a sizeable hole" in the State's three-tier system. *Id.* And when such direct wine shipping is authorized, "the least regulated (and thus the cheapest) alcohol will win." *Id.*
>
> *Furthermore, the direct-shipping option that in-state retailers enjoy in North Carolina is simply another way for them to sell wine to North Carolina consumers. See Whitmer*, 956 F.3d at 873. As we recognized in *Brooks v. Vassar* several years ago, a challenge to a

Virginia statute that permitted only in-state retailers to sell
alcoholic beverages to consumers was "nothing different
than an argument challenging the three-tier system
itself." *See* 462 F.3d 341, 352 (4th Cir. 2006). That challenge
was foreclosed by the *Granholm* decision, which described
the three-tier system as "unquestionably
legitimate." *Id.* (internal quotation marks omitted). And
although the statutory authorization to sell alcoholic
beverages to in-state consumers is not identical to the
privilege to sell *and* ship them to such consumers, the
privilege of shipping alcohol is closely intertwined with the
privilege of selling it. In these circumstances, the
differential treatment with respect to wine shipping by
retailers is an essential aspect of North Carolina's three-tier
system.

*Id.* at 228-29 (emphases added). All three courts of appeals that have

examined this issue post-*Tennessee Wine* have upheld state regimes

allowing in-state retailers (but not out-of-state retailers) to ship or

deliver alcohol to consumers.

C.    Rhode Island's Prohibition on Out-of-State Retailers Delivering
      Alcohol is Constitutional and an Essential Feature of the Three-
      Tier Model

As discussed above, Rhode Island's statutory regime that in-state

retailers (but not out-of-state retailers) may deliver alcohol to

consumers face-to-face is a necessary and essential feature that flows

from the "unquestionably legitimate" three-tier system. Plaintiffs

claim that such a statutory regime that allows in-state retailers to sell

alcohol to Rhode Island consumers – after passing through all three

tiers – but does not permit out-of-state retailers to avoid the three tiers and sell alcohol directly to consumers – violates the dormant Commerce Clause. But at least six courts of appeals – both before and after *Tennessee Wine* – have rejected this argument and upheld similar regimes. *See supra*. All of these cases are premised on the foundation that if alcohol were permitted to be shipped or delivered from an out-of-state retailer directly to an in-state consumer, it would avoid the three-tier model that states are constitutionally permitted to impose.

It was for this very reason that the District Court determined the "in-state retailer requirement is an 'essential feature' of the state's three-tier system of alcohol regulation." Addendum, at 8. The District Court continued, "[g]iven the United States Supreme Court's endorsement of this system as 'unquestionably legitimate' and that finding in Plaintiffs' favor would dismantle this system, the Court cannot find that Rhode Island's alcohol regulatory system violates the dormant Commerce Clause." Addendum, at 8. The District Court's conclusion is supported by at least half a dozen courts of appeals, which have likewise determined that a statutory regime that allows in-state retailers to deliver alcohol to consumers, but does not allow out-of-state

retailers to deliver alcohol to consumers, is essential to the three-tier system. *See supra.*

As the Sixth Circuit recognized, "federal courts have also permitted States … to require retailers to be physically based in the State," *Lebamoff Enterprises*, 956 F.3d at 870, and "there is nothing unusual about the three-tier system, about prohibiting direct deliveries from out-of-state to avoid it, or about allowing in-state retailers to deliver alcohol within the State." *Id.* at 872 ("Opening up the State to direct deliveries from out-of-state retailers necessarily means opening it up to alcohol that passes through out-of-state wholesalers or for that matter no wholesaler at all.").

The Eighth Circuit similarly noted that *Tennessee Wine* "expressly distinguished between the two-year residency requirement at issue and a State's requirement that retail stores be physically located within the State." *Sarasota Wine Mrkt.*, 987 F.3d at 1183. In doing so, the court concluded that the "Missouri laws at issue … are an essential feature of its three-tiered scheme[.]" *Id.* at 1184. *See also Bridenbaugh*, 227 F.3d at 854 ("Wine originating in California, France,

Australia, or Indiana passes through the same three tiers and is subject to the same taxes. Where's the functional discrimination?").

Even if Plaintiffs could pass the first prong of the *Tennessee Wine* different framework test and demonstrate prohibiting out-of-state retailers from delivering alcohol represents discrimination, this Court must reach the second prong and ask "whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Tenn. Wine*, 139 S.Ct. at 2474. As other courts have determined, Rhode Island passes this test.

Most notably, the Supreme Court has recognized that an in-state presence requirement may constitute a legitimate nonprotectionist ground because "the State can monitor the stores' operations through on-site inspections, audits, and the like." *Tenn. Wine*, 139 S.Ct. at 2475. Moreover, even if Rhode Island could "ensure retailer accountability in other ways, there is no other way it could preserve the regulatory control provided by the three-tier system." *Lebamoff Enterprises*, 956 F.3d at 874. As such, the preservation of the "unquestionably legitimate" three-tier model, as well as ensuring

compliance with strict alcohol laws through on-site inspections, are nonprotectionist interests protected by the Twenty-first Amendment. *See B-21 Wines*, 36 F.4th at 227 ("only those discriminatory requirements that are essential features of the three-tier system are authorized by the Twenty-first Amendment").[10]

---

[10] *See e.g., B-21 Wines*, 36 F.4th at 227 ("North Carolina's interest in preserving its three-tier system is itself a legitimate nonprotectionist ground that constitutes a sufficient justification"); *Sarasota Wine Mrkt.,* 987 F.3d at 1182 ("The licensing requirements and restrictions at issue have been consistently upheld, before and after *Granholm* and *Tennessee Wine*, as essential to a three-tiered system that is 'unquestionably legitimate.'"); *Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 743 (5th Cir. 2016) (distinctions between in-state and out-of-state retailers and wholesalers are permissible "if they are an inherent aspect of the three-tier system"); *Wine Country Gift Baskets.com*, 612 F.3d at 818-20 ("Because of *Granholm* and its approval of three-tier systems, we know that Texas may authorize its in-state, permit-holding retailers to make sales and may prohibit out-of-state retailers from doing the same. ... [D]iscrimination that would be questionable, then, is that which is not inherent in the three-tier system itself. ...[A] beginning premise is that wholesalers and retailers may be required to be within the State."); *Arnold's Wines*, 571 F.3d at 191 ("Requiring out-of-state liquor to pass through a licensed in-state wholesaler and retailer ... mandates that both in-state and out-of-state liquor pass through the same three-tier system before ultimate delivery to the consumer."); *Brooks v. Vassar*, 462 F.3d 341, 352 (4th Cir. 2006) (challenging the requirement that out-of-state retailers sell through Virginia's three-tier system "is nothing different than an argument challenging the three-tier system itself," which *Granholm* upheld as "unquestionably legitimate").

Rhode Island's interest in ensuring monitoring through on-site inspections and the preservation of its three-tier system supports Twenty-first Amendment interests.[11]    From a health-and-safety standpoint, Rhode Island's requirement that all alcohol that comes into this state pass through a licensed in-state wholesaler to a licensed in-state retailer ensures that alcoholic beverages are untainted and safe for consumption.  Appendix, at 440-445.  In Rhode Island, alcoholic beverages must come "at rest" at the in-state wholesaler and such a requirement ensures that the licensed wholesalers are not bypassed, thereby preventing grey goods or bootlegged alcoholic beverages not authorized for sale from entering Rhode Island.  Appendix, at 441 (para. 5).  To the contrary, Plaintiffs ask that out-of-state retailers – or those purporting to be out-of-state retailers – be permitted to skip this tier.

Rhode Island's requirement that wholesalers only purchase alcoholic beverages from licensed manufacturers and importers—

---

[11]  The State does not attempt to recite all the concrete evidence supporting the Rhode Island statutory regime, much of which is set forth in the Rhode Island Responsible Beverage Alcohol Coalition Brief. The State respectfully adopts and incorporates this concrete evidence.

inherent to the three-tier system—also makes it less likely for tainted or unsafe products to reach the market. Appendix, at 440-445.  For example, in November 2021, Rhode Island Distributing was notified by the supplier of Sonoma Crest Flowers Chardonnay 2018 of a problem with the quality of the product, within 24 hours the retailers to whom the product was sold were identified and the defective product retrieved; in December 2021, a batch of Balvenie 12 year old scotch was recalled nationwide, Rhode Island Distributing was able to identify the retailers to whom it sold the product and retrieve all defective products; and in March 2021, Rhode Island Distributing discovered that cans of a vodka-based cocktail were exploding due to a secondary fermentation process in the can, again, Rhode Island Distributing was able to identify the retailers to whom it had sold the defective product and retrieve it.  Appendix, at 443-444 (para. 11).  Because Rhode Island wholesalers have "boots on the ground and feet on the street," they were able to notify, mobilize, and retrieve defective product quickly. Appendix, at 444 (para. 12).  Plaintiffs' proposal would allow alcohol into Rhode Island that "passes through out-of-state wholesalers or for

that matter no wholesaler at all," *Lebamoff Enterprises*, 956 F.3d at 872, thus hindering recall efforts.

When alcoholic beverages are shipped directly from an out-of-state retailer, neither RI DBR nor local law enforcement, nor in-state wholesalers, are able to verify that the product offered for sale is what the seller purports it to be, that the product is being sold to someone at least twenty-one years old, or even that the product is fit for human consumption. Appendix, at 288.

From a regulatory perspective, out-of-state retailers pose significant challenges. For one, out-of-state retailers do not have physical premises in Rhode Island. This is problematic because Rhode Island's requirement that licensees have premises in-state is critical to ensuring that licensed wholesalers and retailers comply with applicable laws. As an inspector for RI DBR affirmed, "[i]t is crucial that wholesalers are licensed and present in the state for DBR to be able to conduct in-person inspections as DBR does not have legal authority or resources to inspect out-of-state locations." Appendix, at 286. *See also* Appendix, at 161 (Section 8) ("Rhode Island is a small state with limited resources and is unlikely to be able to afford to

prosecute enforcement action[s] against out-of-state retailers in the same way as in-state licensees.  Thus, an out-of-state retailer would be subject to little scrutiny or enforcement giving it a major market advantage over in-state licensed retailers.").

The in-state-premise requirement also gives local law enforcement the ability to conduct "compliance checks," and see first-hand whether in-state retailers are complying with the laws and regulations related to the sale of alcohol to minors.  According to a 2011 study conducted to evaluate alcohol sales to minors made through the internet, 45% of minors were able to purchase alcohol.  Appendix, at 266.  The study also revealed that "age verification at delivery was inconsistently conducted, and, when attempted, failed about half of the time."  Appendix, at 266.  In 2018, the State of Mississippi conducted on-line sting operations and made it clear that underage children were attempting to purchase alcohol; alcohol was shipped to minors anyway.  Appendix, at 267.  And, in 2020, California conducted an operation that revealed an 80% failure rate of selling alcohol to a minor when a third-

party app was used.[12]  Appendix, at 267.  By prohibiting out-of-state retailers from selling or delivering alcohol, Rhode Island avoids the online misuse and is able to conduct first-hand compliance checks at retail stores having a physical presence.  *See* R.I. Gen. Laws § 3-8-5.1 (authorizing underage compliance checks).

Allowing out-of-state retailers to ship alcohol into Rhode Island and deliver to residents would also subvert Rhode Island's statutory prohibition on the franchising of Class A retail licenses and issuance of licenses to chain stores. *See Wine and Spirits Retailers,* 481 F.3d 1 (1st Cir. 2007).  As one expert opined, given the prohibition on chain stores and franchises, "[a] company that has a chain store located out-of-state would be able to ship to consumers in Rhode Island giving them another advantage in relation to the more burdened Rhode Island retailer." Appendix, at 273-74.  At the very least, even if the chain store and franchise prohibition applied to out-of-state retailers (as it applies

---

[12] Plaintiffs maintain that this case is only about the delivery of wine into Rhode Island and that minors are less likely to order wine as opposed to other alcohol, but the three-tier system (and the laws) that Plaintiffs attack do not distinguish between alcoholic beverages.

to in-state retailers), monitoring and enforcement would be challenging given the out-of-state presence.

Plaintiffs' solution to these incurable ills is for Rhode Island to adopt a licensing or permitting system that would allow out-of-state retailers to ship alcohol into Rhode Island, but such a system does nothing to address the preservation of the three-tier model, or the on-site monitoring and enforcement checks discussed. *See supra*. As an additional example, the sale and delivery of alcohol can be made only during the legal hours of a business, *see* 230 R.I.C.R. § 30-10-1.4.10(B), and while such a requirement can easily be monitored for a retailer with a physical presence in Rhode Island – for example, by enforcement officials driving by the liquor store – ensuring compliance with such a requirement becomes more difficult (if not impossible) for a retailer without a physical presence in Rhode Island.  And, while license revocation for an in-state retailer "'provides strong incentives not to sell alcohol' in a way that threatens public health or safety," the incentive (and penalty) is diminished where a licensee holds multiple licenses allowing them to ship alcohol into multiple states. *See Tenn. Wine*, 139 S.Ct. at 2475.  Quite simply, an out-of-state retailer that

loses a license to import and sell alcohol into Rhode Island is not similarly situated to an in-state retailer that loses a license to sell alcohol in Rhode Island.

"[T]here is nothing unusual about the three-tier system, about prohibiting direct deliveries from out-of-state to avoid it, or about allowing in-state retailers to deliver alcohol within the State." *Lebamoff Enterprises*, 956 F.3d at 872. To the contrary, the in-state presence permits the sale of all legal alcohol – regardless of where it was produced – so long as it passes through the three-tier system. An in-state presence allows states to oversee and verify that alcohol has travelled through its proper channels and ensures accountability and oversight since "the state can monitor the stores' operations through on-site inspections." *Tenn. Wine*, 139 S.Ct. at 2475. *See also Granholm*, 544 U.S. at 523 (Thomas, J., dissenting) ("[s]tate officials can better enforce their regulations by inspecting the premises and attaching the property of in-state entities"). Rhode Island's prohibition on out-of-state retailers selling and delivering alcohol in Rhode Island advances Twenty-first Amendment interests and is supported by concrete evidence.

D.   <u>Prohibiting Both In-State and Out-of-State Retailers From Shipping or Delivering Alcohol Through a Common Carrier is Constitutional</u>

Other than allowing consumers to purchase alcohol on the property of an in-state or out-of-state manufacturer (through a face-to-face purchase), Rhode Island does not permit delivery of alcohol to a consumer by common carrier.  No Class A retailer may ship alcohol to Rhode Island consumers through a common carrier or other third party, but rather in-state retailers may deliver to consumers "only during the legal hours of business for a Class A license *by an employee and/or owner of the licensed establishment*."   230 R.I.C.R. § 30-10-1.4.10(B) (emphasis added).

Plaintiffs do not challenge this provision on facial grounds because, as they put it, "Rhode Island also prohibits in-state retailers from using common carriers to ship wine to residents."  Appellants' Brief, at 6.  Nonetheless, Plaintiffs contend that the "common carrier" prohibition "is discriminatory in effect by preventing most out-of-state retailers from making home deliveries and is not justified as a public safety measure."  Appellants' Brief, at 3.  For reasons similar to those discussed, *supra*, Rhode Island's facially neutral prohibition on

common carrier delivery advances Twenty-first Amendment interests and is supported by concrete evidence.

In *Cherry Hill Vineyard, LLC v. Baldacci*, this Court reviewed a similar restriction where a Maine statute allowed vineyards that produced no more than 50,000 gallons of wine annually ("farm wineries") certain benefits; namely these manufacturers could bypass the wholesalers and sell directly to retailers and/or could bypass the retailers and sell directly to consumers, provided a face-to-face purchase took place on the winery's premise or at an off-site location established by the winery.  505 F.3d 28, 31 (1st Cir. 2007).  While in-state and out-of-state wineries were treated equally, "[s]ales made by farm wineries directly to consumers, wherever consummated, must be face-to-face." *Id*. at 31.  As this Court observed, "[t]his means, of course, that wine cannot be direct-shipped from a winery to a consumer [and] Maine law expressly forbids the furnishing of alcoholic beverages via mail order services." *Id*.

The Maine plaintiffs – represented by the same legal counsel as this case – posed the same constitutional issue that is once again before this Court: they challenged Maine's face-to-face requirement as

"discriminatory in effect, that is, that by allowing direct sales to consumers only in face-to-face transactions, the statutory scheme has the practical effect of benefiting Maine wineries at the expense of their out-of-state competitors." *Id*. at 33.  Later, the plaintiffs elucidated the discrimination claim, which appears to mirror the argument pressed in this case:

> the discriminatory burden imposed by the face-to-face sales requirement and the related ban on direct shipping cannot be justified as necessary to any legitimate governmental interest.  They insist that the State can fulfill its goal of restricting access to alcoholic beverages on the part of underage youths by, say, mandating that carriers delivering wine to direct purchasers confirm that recipients are at least twenty-one years of age.

*Id*. at 34.

Though *Cherry Hill Vineyard* pre-dated *Tennessee Wine* and the "different" inquiry test, this Court nonetheless observed that "the initial burden of establishing discrimination rests with the challenger." *Id*. at 33.  On that issue (effectively, the first prong of what would become the *Tennessee Wine* different framework test), this Court held that "the plaintiffs have not satisfied their initial burden of showing that Maine's statutory scheme is discriminatory in effect." *Id*. at 34.  "Without such evidence," this Court continued, "we must defer to the

state legislature, which 'has 'virtually complete control' over the importation and sale of liquor and the structure of the liquor distribution system.'" *Id.* (quoting *North Dakota*, 495 U.S. at 431).

In reaching this non-discrimination conclusion, this Court reviewed *Granholm* and explained that "Maine flatly outlaws any and all direct shipping of wine. Consequently, there is no direct-shipping market; neither in-state nor out-of-state wineries may direct-ship." *Id.* at 35. "In the absence of any explicit (i.e., facial) discrimination, the plaintiffs must persuade us that Maine's evenhanded requirement that all wine purchases be made face-to-face camouflages some more sinister reality; that its practical effect is invidiously discriminatory. This is a burden that litigants in analogous cases ordinarily have failed to carry." *Id.* at 36.

It is true that *Cherry Hill Vineyard* concerned a face-to-face requirement at the producer level (at purchase) – and this case concerns a face-to-face requirement at the retail level (at delivery) – but Plaintiffs have failed to carry the burden of demonstrating that Rhode Island's admittedly evenhanded requirement to bar all common carrier delivery at the retail level represents invidious discrimination.

Even if Rhode Island permitted common carrier delivery, out-of-state retailers would still be unable to deliver alcohol to Rhode Island consumers because doing so would contravene the three-tier model.  In this respect, out-of-state retailers are prohibited from delivering any alcohol inside of Rhode Island, regardless of the common carrier prohibition.

This Court's admonishment in *Cherry Hill Vineyard* applies equally to this case:

> the plaintiffs have proffered no evidence that permitting farm wineries to sell only face-to-face, either on premises or at approved in-state locations, discriminates against interstate commerce.  There is no evidence that Maine law acts to protect Maine vineyards or that Maine consumers substitute wines purchased directly from Maine vineyards for wines that they otherwise would have purchased from out-of-state producers.  There is not even evidence that any wines at all are purchased by consumers directly from Maine vineyards.

*Id*. at 36.  *See also id*. at 37 ("the plaintiffs have not shown a single penny of losses attributable to the allegedly discriminatory farm winery exception").

Here, the Plaintiffs contend that the common carrier prohibition "causes good sold and delivered by local retailers to constitute a larger share of the wines sold online," and that most of the wine being sold in

the United States is available from out-of-state retailers, as opposed to in-state retailers. Appellants' Brief, at 29. Plaintiffs submit that Rhode Island (which has a population of about 1 million people) has authorized about 22,800 wines for sale, which represents about 5% of the number of wines approved for sale in the United States.[13] Appellants' Brief, at 7.

But as previous courts have recognized, "the extent of the State's responsibility for that gap is not clear." *Lebamoff Enterprises*, 956 F.3d at 875. "Some winemakers may seek higher margins by selling exclusively at 'high-end' restaurants or at their own vineyards, and others may lack the capacity to produce enough wine for wide distribution." *Id. See also* Appendix, at 161 (as of January 2021, 81% of wineries in the United States produce less than 5,000 cases a year). While Plaintiffs contend that the common carrier prohibition is responsible for harming out-of-state retailers, as this Court made clear when these same attorneys made similar arguments, "the plaintiffs acknowledge that the 'constricted availability of wine is due in large

---

[13] In comparison, Michigan, which has a population approximately 10 times that of Rhode Island, has authorized for sale approximately 44,000 brands of wine. *See Lebamoff Enterprises*, 956 F.3d at 875.

part to the three-tier system itself." *Cherry Hill Vineyard*, 505 F.3d at 38.

Indeed, many of the cases cited herein have upheld statutory schemes permitting in-state retailers (but not out-of-state retailers) to ship using a common carrier.[14] *See e.g., Sarasota Wine Mkt.,* 987 F.3d at 1184; *Lebamoff Enterprises*, 956 F.3d at 872. Allowing common carrier shipping (where the retailer and the consumer may never meet face-to-face at either the purchase stage or the delivery stage) is significantly broader than the face-to-face deliveries Rhode Island law permits Class A retailers.

The Seventh Circuit distinguished between laws that allow in-state shipment via common carrier (like Illinois' challenged law) versus laws that only allow in-state delivery (like Rhode Island): "[L]ocal deliveries are different in kind from state-wide deliveries through a carrier. The former delivery scheme is logically tied to an in-state presence (how else would the deliveries be accomplished locally?), while

---

[14] It should not be lost that the provision allowing any farmer winery (producers/manufacturers) to ship directly to consumers also requires that the consumer purchase the alcohol on the winery's premise at the time of sale. *See* R.I. Gen. Laws § 3-4-8(a). Accordingly, a face-to-face purchase is necessary.

the latter form of delivery makes an in-state presence unnecessary." *Lebamoff Enterprises, Inc. v. Rauner*, 909 F.3d 847, 857 (7th Cir. 2018). The Seventh Circuit recognized that local deliveries by in-state retailers are "constitutionally benign." *Id.* (quoting *Wine Country Gift Baskets.com*, 612 F.3d at 850).

Even if Plaintiffs are able to pass the first prong of the "different" framework test, Rhode Island can present concrete evidence that the common carrier prohibition advances Twenty-first Amendment interests. As a threshold matter, Plaintiffs' claims about wine availability in Rhode Island are exaggerated. Though Plaintiffs alleged in their Complaint that they seek to purchase rare, unusual, and highly allocated wines, the evidence in the record told a much different story. Plaintiff Anvar described himself as "a casual kind [wine] drinker." Appendix, at 232. On one occasion he sought to purchase a wine unavailable at his local retailer, the retailer special ordered it for him. Appendix, at 235-236. Plaintiff Anvar was unable to identify "any of the rare wines that are available out-of-state but not to Rhode Islanders." Appendix, at 233-234. These are hardly claims that support dormant Commerce Clause challenges.

Plaintiff Drum similarly described her wine consumption as that of a "novice." Appendix, at 241. Other than a single occasion when she sought to purchase a particular Barolo wine, Drum was unable to identify a single wine that she sought to purchase that was unavailable in Rhode Island. Appendix, at 249-250. As for the Barolo wine, Drum limited her search on that occasion to three liquor stores in Newport, Rhode Island, and did not contact other stores elsewhere in Rhode Island. Appendix, at 242. Since that occasion, the Newport liquor stores have expanded their Barolo selection. Appendix, at 244. As noted in *Lebamoff*, and as exemplified by this record, there are other reasons, aside from restricting direct shipment, why certain wines may be unavailable in a certain market. 956 F.3d at 875.

Drum's testimony also provides concrete evidence supporting Rhode Island's prohibition on any Class A retailer shipping alcohol. Drum testified about an out-of-state retailer based in New York that mailed Plaintiff wine (illegally) in Rhode Island, which was delivered via common carrier. Appendix, at 247. Drum acknowledged that when the wine was delivered, the common carrier making the delivery did not ask to see a form of identification to verify her age, as required by

Rhode Island law.  Appendix, at 288.  It is for this very reason that Rhode Island requires delivery by the license holder (or an employee), rather than rely on a non-license holder, such as a common carrier, with little to lose for the illegal delivery of alcohol.

Drum's testimony – by itself – provides concrete evidence supporting Rhode Island's nonprotectionist goals requiring that only a Class A license holder (or an employee) deliver alcohol to a consumer and verify the identification and age of the consumer at the risk of losing a license.  *See Tenn. Wine*, 139 S.Ct. at 2475 (losing a license provides "strong incentives" not to sell alcohol in violation of state law). Other concrete evidence supporting the common carrier prohibition is discussed, *supra*.

***

While Plaintiffs frame their argument in terms of choice and efficiency – and claim a dormant Commerce Clause violation where state laws interfere with choice, efficiency, and cost – they present no evidence that the common carrier prohibition – as opposed to the three-tier model – "disproportionately burdens interstate commerce." *Cherry Hill Vineyard*, 505 F.3d at 37.

"Whether in Michigan, Utah, or elsewhere, this is not Adam Smith's idea of an efficient market." *Lebamoff Enterprises*, 956 F.3d at 868.  But, "efficiency is not the goal of the Twenty-first Amendment, whether in the form of easy-to-get alcohol or easy-to-pay for alcohol." *Id*.  As the Sixth Circuit recognized, "some reduction in consumer choice, it seems to us, flows ineluctably from a three-tier system." *Id*. at 875.  "The purpose of the system, for better or worse, is to make it harder to sell alcohol by requiring it to pass through regulated in-state wholesalers." *Id*.  Rhode Island's common carrier prohibition passes constitutional muster.

## VI.  CONCLUSION

The Judgment should be affirmed.[15]

---

[15] The State submits that this Court should reject Plaintiffs' plea for a remedy.  Nonetheless, the State advises that Rhode Island law provides that "[i]f any provision of this title, or its application to any person or circumstance, is determined by a court to be invalid or unconstitutional, the remaining provisions and sections shall be construed in accordance with the intent of the general assembly to limit rather than expand commerce in alcoholic beverages and to enhance strict regulatory control over taxation, distribution, and sale of alcoholic beverages through the three-tier regulatory system imposed by this title upon all alcoholic beverages."  R.I. Gen. Laws § 3-1-6(b).

Respectfully Submitted,

PETER F. NERONHA, in his official capacity as Attorney General of Rhode Island; ELIZABETH K. DWYER, in her official capacity as Interim Director of RI Department of Business Regulation

By:

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Michael W. Field*
Michael W. Field, No. 91695
Assistant Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2380
mfield@riag.ri.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

√  **this brief contains <u>12,999</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).**

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

√  **this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14 point Century Schoolbook.**

*/s/ Michael W. Field*
Attorney for State Defendants-Appellees
Dated: April 17, 2023

## <u>CERTIFICATION</u>

I, the undersigned, hereby certify that I filed the within document via the ECF filing system and that a copy is available for viewing and downloading. I have also caused a copy to be sent via the ECF System to counsel of record on this 17th day of April, 2023.

*/s/Michael W. Field*

# ADDENDUM

Doc. 92 Memorandum and Order ..................................................................... A-001

Case: 22-1843     Document: 00117999463     Page: 73     Date Filed: 04/18/2023     Entry ID: 6562467

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

KAMBIS ANVAR and MICHELLE
DRUM,
      Plaintiffs,

      v.

ELIZABETH KELLEHER DWYER,
Interim Director of Department of
Business Regulation,[1] and PETER F.
NERONHA, Attorney General of
Rhode Island
      Defendants,

      v.

RHODE ISLAND RESPONSIBLE
BEVERAGE ALCOHOL COALITION,
INC.
      Intervenor Defendant.

C.A. No. 19-523-JJM-LDA

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief Judge, United States District Court.

Plaintiffs Kambis Anvar and Michelle Drum are wine consumers who live in Rhode Island and want to buy wine from out-of-state retailers and have it delivered directly to them in Rhode Island. Rhode Island's three-tier statutory scheme regulating the sale and distribution of alcohol prevents the sale of alcohol directly to consumers unless it is from licensed retailers in residence that get the alcohol from

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Court substitutes Elizabeth Kelleher Dwyer, Interim Director of the Department of Business Regulation, in her official capacity, as plaintiff for Elizabeth M. Tanner.

Case: 22-1843   Document: 00117999463   Page: 74   Date Filed: 04/18/2023   Entry ID: 6562467

licensed wholesalers. Plaintiffs filed this suit, alleging that those laws discriminate against out-of-state businesses, thereby violating the dormant Commerce Clause, and now move for summary judgment. ECF No. 58. Elizabeth Kelleher Dwyer in her official capacity as Interim Director of the Rhode Island Department of Business Regulation ("DBR") and Peter F. Neronha in his official capacity as Rhode Island Attorney General and Intervenor Defendant Rhode Island Responsible Beverage Alcohol Coalition, Inc. (collectively "State Defendants")[2] object to Plaintiffs' motion and have cross-moved for summary judgment, arguing that the way that Rhode Island regulates alcohol sales and distribution aligns with the Twenty-first Amendment to the United States Constitution and is permissible under the dormant Commerce Clause. *See* ECF Nos. 64, 70. For the reasons below, the Court GRANTS Defendants' Motions for Summary Judgment (ECF Nos. 64 and 70) and DENIES Plaintiffs' Motion for Summary Judgment (ECF No. 58).

## I.  BACKGROUND

Plaintiffs are wine enthusiasts who wish to purchase online unique and rare bottles of wine from out-of-state retailers for shipment to their homes. Rhode Island's liquor control laws, however, prevent their wish from being realized. The state's three-tier system of alcohol regulation began in the early 20th century when the states ratified the Twenty-first Amendment. U.S. CONST. amend. XXI. "The ratification of the Twenty-first Amendment ended Prohibition and gave states

---

[2] Because the interests of the Rhode Island Responsible Beverage Alcohol Coalition, Inc., the Intervenor Defendant, align with those of the named State Defendants, the Court refers to them collectively as Defendants.

Case: 22-1843    Document: 00117999463    Page: 75    Date Filed: 04/18/2023    Entry ID: 6562467

substantial control over the regulation of alcoholic beverages. Most states . . . then imposed a three-tier system to control the sale of alcoholic beverages within their territories." *Fam. Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 5 (1st Cir. 2010); *Granholm v. Heald*, 544 U.S. 460, 488 (2005) (quoting *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980)) (§ 2 of the Twenty-first Amendment "'grant[ed] the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system.'").

The typical three-tier system[3] is one in which "'the producer sells to a licensed in-state wholesaler, who pays excise taxes and delivers the alcohol to a licensed in-state retailer. The retailer, in turn, sells the alcohol to consumers, collecting sales taxes where applicable.'" *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1176 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 335 (2021) (quoting *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 187 (2d Cir. 2009)). "The hallmark of the three-tier system is a rigid, tightly regulated separation between producers, wholesalers, and retailers of alcoholic beverages." *Fam. Winemakers*, 592 F.3d at 5. "A primary purpose of this model is to prevent a return to 'the English tied-house system' in which alcohol producers monopolized distribution from producer to consumer, a system widely perceived as causing or at least contributing to the social ills of excess alcohol consumption and consumption by minors." *Sarasota Wine*, 987 F.3d at 1176; *Tenn.*

---

[3] This version of the three-tier system described by the affirming courts mirrors Rhode Island's system.

Case: 22-1843   Document: 00117999463   Page: 76   Date Filed: 04/18/2023   Entry ID: 6562467

*Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2463 n.7 (2019) (the tied-house system "often encouraged irresponsible drinking").

Rhode Island regulates the sale and distribution of alcohol through these statutes and administrative rules:

a.   R.I. Gen. Laws § 3-4-8(a) makes it unlawful for anyone in the business of selling intoxicating beverages in another state or country to ship any intoxicating beverage directly to a Rhode Island resident other than a licensed Rhode Island wholesaler.[4]

b.   R.I. Gen. Laws § 3-5-10 states that a retailer license may be issued to residents of Rhode Island and corporations incorporated in another state and authorized to do business in Rhode Island.

c.   R.I. Gen. Laws § 3-7-18 requires that licensed Rhode Island retailers buy from licensed Rhode Island wholesalers ("in-state wholesale purchase requirement").

d.   230 R.I. Admin. Code 30-10-1.4.19(B)(1) is the "at rest" law under which all alcoholic beverages brought into Rhode Island for resale must be consigned and delivered to a licensed Rhode Island wholesaler.

e.   230 R.I. Admin. Code 30-10-1.4.27 requires that the retailer license must identify a premises for operation under the license ("retailer presence requirement").

f.   230 R.I. Admin. Code 30-10-1.4.10 provides that the owner or employee of a Class A retailer license holder may deliver alcoholic beverages to the residence of a customer.  The licensed Rhode Island retailer may not use a common carrier for delivery.

g.   R.I. Gen. Laws § 3-5-11 prohibits the issuance of certain alcohol-related licenses to "chain store organizations."

h.   R.I. Gen. Laws § 3-5-15 vests with licensing boards and/or town

---

[4] The state makes an exception for an order placed personally by the purchaser at the manufacturer's premises to be shipped to a Rhode Island address for non-business purposes; that is, Rhode Island consumers may buy wine while on the premises of an out-of-state winery and have it delivered by common carrier to their Rhode Island residences.

Case: 22-1843   Document: 00117999463   Page: 77   Date Filed: 04/18/2023   Entry ID: 6562467

councils the authority to grant retailer licenses up to the maximum number fixed by DBR.

    i.    R.I. Gen. Laws § 3-5-17 requires notice and a hearing before certain retailer licenses can be granted.

*See* ECF No. 71 at 13. In practice, Rhode Island requires that licensed retailers and wholesalers have a physical presence in the State and mandates that retailers buy only from in-state wholesalers. It does not impose a residency requirement on retailers or wholesalers. In deciding these motions for summary judgment, the Court must decide whether Rhode Island's three-tier system of alcohol regulation violates the dormant Commerce Clause.

## II.   STANDARD OF REVIEW

Summary judgment is proper when the pleadings, discovery, and affidavits, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. To decide whether summary judgment is suitable, the court analyzes the record in the light most favorable to the nonmovant and draws all reasonable inferences in that party's favor. *See Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997). "When reviewing cross-motions for summary judgment, [courts] must decide whether either of the parties deserves judgment as a matter of law on facts that are not disputed. [Courts] review each motion independently and view the record in the light most favorable to the nonmoving party when doing so." *Dahua Tech. USA Inc. v. Feng Zhang*, 988 F.3d 531, 539 (1st Cir. 2021) (citation omitted) (internal quotation omitted); *see also Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir. 1996) ("Cross

Case: 22-1843   Document: 00117999463   Page: 78   Date Filed: 04/18/2023   Entry ID: 6562467

motions simply require [courts] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.").

## III.   DISCUSSION

"[T]he [Supreme] Court staunchly affirmed the 'right of the States,' in exercising their 'police power,' to 'protect the health, morals, and safety of their people,' but also cautioned that this objective could be pursued only 'by regulations that do not interfere with the execution of the powers of the general government, or violate rights secured by the Constitution of the United States.'" *Tenn. Wine*, 139 S. Ct. at 2464 (quoting *Mugler v. Kansas*, 123 U.S. 623, 659 (1887)).  This is where the Commerce Clause enters the discussion.  It prohibits states from discriminating against the flow of goods in interstate commerce.  At its core, the dormant aspect of the Commerce Clause "precludes States from 'discriminat[ing] between transactions on the basis of some interstate element.'" *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015) (quoting *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 332 n.12 (1977)).  The dormant Commerce Clause forbids protectionism where in-state interests are positively impacted, and out-of-state interests suffer negative consequences.

In cases involving dormant Commerce Clause challenges to the regulation of alcohol, courts have moved beyond the starting point of an automatic per se constitutional violation to a less strict test[5] where they are encouraged to engage "in

---

[5] Plaintiffs argue that the more rigorous "searching scrutiny" standard applies, while Defendants argue for the less stringent "different inquiry" test.  After reviewing

a different inquiry." *Tenn. Wine*, 139 S. Ct. at 2474. "Recognizing that § 2 was adopted to give each State the authority to address alcohol-related public health and safety issues in accordance with the preferences of its citizens, [the court asks] whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.* This does not give states carte blanche to discriminate against out-of-state interests; there must be "concrete evidence" that the rule or regulation "actually promotes public health or safety," or evidence that "nondiscriminatory alternatives would be insufficient to further those interests." *Id.* (citing *Granholm,* 544 U.S. at 490).

With the issues framed and review standard set, the Court moves to the substance of the cross-motions. Plaintiffs challenge the very basis of Rhode Island's three-tier alcohol regulations system. They ask the Court to strike down under the dormant Commerce Clause Rhode Island's requirements that require alcohol retailers to have a presence in the state, to obtain the alcohol from Rhode Island licensed wholesalers, and prohibit the delivery of alcohol by common carrier. Defendants argue that Rhode Island's statutory scheme reflects a valid state interest and an adequate public health concern, allowing it to withstand the differing inquiry standard. The Court agrees with Defendants' position.

Courts should uphold laws that serve valid state interests such as "promoting temperance, ensuring orderly market conditions, and raising revenue." *North*

---

extensive caselaw and the parties' arguments, the Court finds that the "different inquiry" test set out in *Tennessee Wine & Spirits* applies here.

Case: 22-1843   Document: 00117999463   Page: 80   Date Filed: 04/18/2023   Entry ID: 6562467

*Dakota v. United States*, 495 U.S. 423, 432 (1990). "Given the special protection afforded to state liquor control policies by the Twenty-first Amendment, they are supported by a strong presumption of validity and should not be set aside lightly." *Id.* at 433. When a state "has established a comprehensive system for the distribution of liquor within its borders[,] [t]hat system is unquestionably legitimate." *Id.* at 432 (citing *Carter v. Virginia*, 321 U.S. 131 (1944); *California Bd. of Equalization v. Young's Mkt. Co.*, 299 U.S. 59 (1936)); *Granholm*, 544 U.S. at 489. Given the United States Supreme Court's endorsement of this system as "unquestionably legitimate" and that finding in Plaintiffs' favor would dismantle this system, the Court cannot find that Rhode Island's alcohol regulatory system violates the dormant Commerce Clause.

Turning to the specifics of Rhode Island's system,[6] as to its requirement of an in-state presence for retailers, the Supreme Court held that "[t]he Twenty-first Amendment . . . is binding on the Federal Government like everyone else, and empowers [the state] to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler." *North Dakota*, 495 U.S. at 447. An in-state retailer requirement is an "essential feature" of the state's three-tier system of alcohol regulation and promotes the health and safety of Rhode Islanders because it allows the state to conduct on-site inspections and audits to check compliance with the law, and to revoke operating licenses providing "'strong incentives not to sell

---

[6] *See generally*, ECF No. 65-31 for a credible factual recitation of the positive public health and safety impact from Rhode Island's current three-tiered system of alcohol regulation.

Case: 22-1843   Document: 00117999463   Page: 81   Date Filed: 04/18/2023   Entry ID: 6562467

alcohol' in a way that threatens public health or safety." *Tenn. Wine*, 139 S. Ct. at 2475 (quoting *Granholm*, 544 U.S. at 490). Retail licensees must keep and have available for inspection on their licensed premises all purchase and sale records. ECF No. 65-33 at 3, ¶ 18. This allows the state to regulate alcohol to prohibit threats to Rhode Islanders' public health and safety as the State finds appropriate.

The requirement that retailers buy alcohol only from in-state licensed wholesalers also serves the public's health and safety. Licensed Rhode Island wholesalers are subject to on-site inspections of its licensed premises. ECF No. 75 at 3, ¶ 9. Before a wholesaler license is issued, the premises must undergo and pass DBR inspection. *Id.* The local fire safety agency also conducts an on-site inspection of the licensed premises. *Id.* As a condition of their licenses, Rhode Island wholesalers must make their premises (including their books and records) available for a DBR inspection. *Id.* They undergo an annual on-site inspection and audit of their total state tax filings, including alcohol beverage-related excise tax and container tax filings. *Id.*

Finally, Rhode Island's restriction on common carrier delivery of alcohol is nondiscriminatory between in-state and out-of-state retailers. No retailers, regardless of their location, can deliver alcohol via common carrier. 230 R.I. Admin. Code 30-10-1.4.10 (provides that retailers may not use a common carrier for delivery).

The Court need go no further into Rhode Island's three-tier system of alcohol regulation. Because the Twenty-first Amendment gave states greater leeway under the dormant Commerce Clause to regulate alcohol within their borders, the United

States Supreme Court in *North Dakota* and *Granholm* approved states' three-tier systems as an "unquestionably legitimate" exercises of valid state interests, and Rhode Island's scheme is grounded in its pursuit of public health and safety, the Court finds that the challenged laws and regulations do not violate the dormant Commerce Clause and are constitutional.

## IV. CONCLUSION

The Court DENIES Plaintiffs' Motion for Summary Judgment.  ECF No. 58.

The Court GRANTS Defendants' Motions for Summary Judgment.  ECF Nos. 64, 70.


IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Chief Judge

September 29, 2022